UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X   Civ. No.

BRYAN SEXTON,

                    Petitioner,

         v.                            PETITION TO VACATE

JAKE KARAM, KENT HUGHES,
VLADIMIR SHUSHKOVSKY, and IAN WINTER ,

                    Respondents.

--------------------------------------------------------X

      Petitioner, Bryan Sexton, by his attorney Leslie Trager for his petition alleges:

      1. Petitioner brings this action to vacate an award issued by an arbitration panel for the International Center for Dispute Resolution ("ICDR") on the grounds that: 1. pursuant to 9 U.S.C. section 10(a)(1) the award was "procured by corruption, fraud, or undue means," in that the award given to petitioner is not the award initially filed with the ICDR by the panel but was substituted with another award by respondents with the aid of certain persons working at the ICDR and 2. that pursuant to 9 U.S.C. section 10(a)(2) and (4) on the grounds that if in fact the award received by petitioner is the initial award, then it does not comply with the applicable rules of the ICDR which required a reasoned award in that the findings are such as to make the award irrational and shows evident partiality. (Copy of award attached as Exhibit A).

1

## JURISDICTION AND VENUE

2.  Jurisdiction is based on diversity pursuant to 28 U.S.C. 1332 in that the parties are either from states other than the one where petitioner resides or are from foreign countries and the amount in controversy exceeds $75,000.

3.  Plaintiff is a resident of Florida.

4.  Respondents Jake Karam ("Karam"), Vladimir Shushkovsky ("Shushkovsky") and Ian Winter ("Winter") are residents of Canada.

5.  Respondent Kent Hughes ("Hughes") is a resident of Massachusetts.

6.  Venue is proper in this district pursuant to 9 U.S.C. section10 in that the arbitration proceeding before the ICDR was held in this district in New York, NY.

## BACKGROUND FACTS

7.  During the period 2005-2006,petitioner invested $133,334 in an enterprise entitled "Red Star Poker."  This represented a 1.75% interest in this enterprise.

8. Petitioner made this investment as the result of being introduced through mutual friends to Justin Sather ("Sather").

9.  Sather had conceived of the idea of organizing an online poker site for Russia and other Eastern European countries in 2004.  He started the organization with another person whom he knew from professional hockey - Shushkovsky. Shushkovsky was familiar with Russia.

10.  Shushkovsky in turn brought in Karam and Hughes.

11.  The four founders - Sather, Karam, Hughes and Shyshkovsky - raised money and hired the necessary technical help to develop the poker site.

12.  Although Sather had the largest interest of the four founders (32%), by the fall of 2005, Sather had been forced out of the company.

13.  With Sather out of the company, petitioner ended up being the only investor who had been brought in by Sather.  Most of the other shareholders had ties to professional hockey.

14.  Petitioner was informed that the holding company owning all of the Red Star Poker enterprise was CC Capital, Inc. ("CC Capital") and that he was therefore a shareholder in CC Capital.

15.  Red Star Poker was officially launched in June 2005.  Attendees at the launching included celebrities and athletes with the main event scheduled as a poker match between well-known hockey players Vincent Lecavalier and Ilya Kovalchuk in a hot air balloon in order to set a record for the highest outdoor poker game for the Guinness Book of World Records.

16.  Until February 2008, petitioner did not receive any written reports relating to Red Star Poker.  He was then informed by Hughes that there had been prior reports sent to all other Red Star shareholders other than petitioner. Karam told petitioner that

3

he had sent the earlier reports to him by email, but that his email could not send to AOL addresses (which petitioner had) and that for the prior three year period, Karam had never noticed that his emails to Sexton were not going through.

17.   During the period 2008 through the first quarter of 2010, petitioner received dividends purportedly on his CC Capital stock.

18.  In August 2010, petitioner was informed by Karam that Red Star Poker had fallen on hard times and could no longer afford to pay dividends.

19.   Petitioner observed that the Red Star Poker site seemed to be constantly improving and attracting many players, which should have meant a prosperous company, rather than a declining one.   In fact, Red Star Poker has continued to prosper and today is a leading gaming site catering to the Russian market, with such offerings as online poker, video poker, slot machines, progressive slot machines, sports betting, live sports betting, blackjack, craps, roulette and baccarat with live dealer option.

20.  Petitioner's expert valued the Red Star Poker enterprise as of November 7, 2012 at $1,022,860,000 and petitioner's 1.75% interest at $17,900,000.  No other expert evidence as to the valuation of the Red Star Poker enterprise was offered at the arbitration hearings.

21.  Petitioner's review of the CC Capital shareholder reports found many

inconsistencies.  His further investigation lead him to conclude that CC Capital was not the real owner of Red Star Poker and that he was being frozen out of his participation in the success of Red Star Poker to which he was entitled.

22. Karam and Shushkovsky admittedly still control the Red Star Poker enterprise.  Hughes claims he was brought out by Cake Gaming, N.V. ("Cake")in June 2009.  The evidence adduced at the arbitration hearings demonstrated that in fact Hughes still remained a shareholder in the Red Star Poker enterprise and that the money purportedly paid by Cake for Hughes shares in CC Capital came from Red Star Poker.

23.  Winter was a *de facto* employee of Cake, first as the COO at Yummy Interactive, (Canada) Inc. ("Yummy') and later as a "consultant" to Yummy performing the COO functions.  Yummy is a Canadian company located in Vancouver which established Cake.  Cake provided the software operating Red Star Poker from 2007 until 2012.

24.  Winter supplied the fictitious monthly invoices to Red Star Poker purportedly from Cake and assisted Hughes in making it appear that Cake had bought Hughes' interest in the Red Star Poker enterprise through the acquisition of Hughes' CC Capital shares.

25.  In June 2011, petitioner commenced an arbitration before the ICDR.

5

## I.     THE JULY 28, 2014AWARD WAS PROCURED BY CORRUPTION.

26. As will be detailed herein, evidence discloses that documents were prepared by respondents for transmittal by the ICDR and that an award issued in May 2014 by the arbitration panel was substituted by respondents with the help of a person or persons at the ICDR with a purported award issued on July 28, 2014.  As a result, petitioner has never seen the May 2014 award.  The existence of the May 2014 award has been confirmed by documents received from the ICDR and admissions by an employee at the ICDR.

27.  Hearings were held in New York City during the entire week of December 9, 2013.

28.  After the close of the hearings, petitioner requested to be allowed to submit post hearing briefs, which request was granted and the parties submitted these.

29.  On February 25, 2014, the arbitration panel issued a Second Post-Hearing Procedural Order providing that petitioner's reply brief and all submissions for costs and fees be submitted 10 days after respondents' answering briefs which were due on March 27, 2014.  Part D of this order provided: "Upon the parties submissions of their fees and costs, the record will be closed."  The order concluded:  "The Tribunal intends to render its award shortly after the final briefing."

30.  On March 26, case manager Carmen Preda sent an email to counsel for

Hughes and Winter, with a copy to petitioner's counsel, asking if they could pay their bills by the end of the week and concluding that the arbitrators would "like to render a decision in 10 days and the payment must be secured beforehand."

31. On April 3, 2014, the chairman of the arbitration panel sent an email stating that cost submissions and reply brief were due by April 7, that no further briefing would be accepted after that date and that "the Tribunal intends to render the final award as soon as possible once the April 7 submissions are received."

**The First ICDR Letter Prepared by Respondents for the ICDR.**

32. On May 6, 2014, an email attaching a letter of same date was sent by Carmen Preda, a case manager for the ICDR (Attached as Exhibit B). This letter stated that the "Hearing are declared closed as of April 7, 2014..." This letter was a month late.

33. The letter further provided that not only should the parties no longer communicate directly with the arbitrators, but that "any and all communications shall be directed to the ICDR copying the other parties." This latter statement was highly unusual in that it is frequently necessary to contact the ICDR as the neutral administrator without notice to the other parties about subjects that have no connection with the other parties such as invoicing.

34. An examination of the May 6, 2014 letter discloses information which

Carmen Preda did not know and information which she should have known to be incorrect.  Thus, in the May 6 letter, the address for counsel to petitioner was not listed as his office at 230 Park Avenue, New York, NY 10169, but as his Washington DC home address. Counsel had moved Washington DC  approximately eighteen months earlier. (For reasons of privacy, the street address is redacted from the attached letter). At no time had petitioner's counsel ever disclosed this home address in Washington DC to anyone at the ICDR, nor was there any reason for Carmen Preda to address counsel at his home address as counsel continues to maintain his New York office.

35.  Only two people connected with the arbitration could have been aware of counsel's new home address: the Chairman to whom counsel had mentioned this in a casual conversation and counsel for respondent Hughes, who may have noticed that a telephone call from petitioner's counsel was from a 202 area code.  In addition, petitioner's counsel's Washington, DC address was not readily available to the internet as counsel had moved recently and was not established in Washington, DC.

36.  Further, this May 6, 2014 letter was incorrectly addressed to Hughes' counsel, Nathaniel Dudley at McGivney and Kluger, P.C.  Dudley had informed all participants in the arbitration and the ICDR on January 21, 2013 that he was no longer with that firm.   On that date, Dudley wrote that "effective today, my new contact information will be as follows: ... Eckert Seamans Cherin & Mellot, LLC...." with an

email address of "ndudley@eckertseamans.com."  Thus, for well over a year, Carmen Preda had communicated with Dudley at his new, correct address and there would be no reason for her to make this mistake in 2014.

37.  Later discovered evidence has disclosed that the May 6, 2014 letter was prepared by, and perhaps sent by, the office of Irvin Schein, attorneys for respondents Karam and Shushkovsky because the mistaken Dudley address also appears on communications sent from Schein's office.

38.  Upon information and belief, the real purpose of this May 6, 2014 letter was to warn petitioner away from making any communications which might interfere with respondents' scheme to substitute the real award submitted by the panel in May 2014 with the later false award of July 28, 2014.

39.  Petitioner did not take any action with respect to this letter at that point.

**Proof of the May, 2014 award.**

40.    The next communication from the ICDR was an invoice dated June 5, 2014 and received by petitioner via the US Postal Service on June 16, 2014 (copy attached as Exhibit C).  Although all previous billing increases prior to June 5 had been received by petitioner by email from the ICDR, this invoice was sent only by standard mail.

41.  The primary entry on this invoice was a charge entered on May 16, 2014

for "Fee for Increased Claim" in the amount of $3,390. Permission to increase petitioner's claim had been granted by the arbitration panel on March 11-12, 2013 in an email exchange.  At the time Carmen Preda had informed Sexton that given the high level of charges in this case, the fee would be waived.

42.  Thus, there was no reason for the ICDR to revisit or even think about this issue unless an award had been forwarded by the panel to the ICDR.  This is because it is the standard practice at the ICDR and the American Arbitration Association ("AAA") (the ICDR is a division of the AAA), upon the receipt of a draft award, for the case manager and the accounting office to go through the charges and to divide such charges  among the parties to the arbitration in accordance with the arbitrators' directions in the award.  Thus, the receipt of a draft award would trigger the review of the charges, which could result in missed charges being imposed.

43.  A draft award  award represents the final award, except for the division of such charges, which are incorporated by the ICDR in the award.  The draft award is also reviewed by the ICDR for proper form and typographical errors, but no changes in the substance should ever be made by anyone at the ICDR or the AAA.  Once the draft award is finalized by the ICDR so as to reflect the division of the charges and the corrections for form and typos, it is returned to the arbitrators for signature.  This process usually takes less than two weeks.

44. Upon receipt of this invoice, petitioner telephoned Carmen Preda and asked why he was receiving an extra charge for a filing fee after the case had been submitted to the arbitrators. Preda stated to petitioner that an award had been received in May 2014 and a review of this award had uncovered an "accounting error" regarding the filing fee. Petitioner reminded Preda that she had informed him in March 2013 that this fee would be waived. Preda replied that the decision in March of 2013 to waive the fee was a mistake and the ICDR would no longer be able to waive the fee.

45. Petitioner asked Preda when this award would be sent out. Preda stated that the award only needed to be signed and notarized before being sent out. However, Preda informed petitioner that the signing had been held up because of an illness in a member of the panel's chairman's family.

46. In order to be sure that the unpaid invoice of June 5 would not hold up the issuance of an award, this invoice was paid on June 23, 2014.

47. Thus, by May 16, 2014, there was essentially a final award because at most all that remained to finalize the award were administrative procedures. But, this May award was never sent to petitioner.

48. Upon information and belief, the arbitrators also signed the final award in May, 2014, and sent such signed award to the ICDR, but such final award has not been sent to the petitioner.

49.  Based upon the foregoing evidence petitioner concludes that Carmen Preda corruptly assisted in replacing the May award with the later award of July 28, 2014.

50. It appears that the June 5 invoice was deliberately delayed by not notifying petitioner by email of its existence, as had been done with all prior increased billings.

**The delayed "Final Award."**

51.  Normally, awards are delivered within 60 days after the close of the hearings, here April 7, 2014. Present rules, effective June 1, 2014, of the ICDR require them to be issued within 60 days.

52.  After over 100 days had passed with no communication from the arbitrators regarding this delay (a rather unusual circumstance), on July 22, 2014, counsel for petitioner telephoned Thomas Ventrone, Vice President of the ICDR to ask him about the lack of any award.  Mr. Ventrone stated that he would look into the matter.

53.  On July 24, Mr. Ventrone telephoned petitioner's counsel and informed him that a "draft" of the award had just been received and it would be finalized and sent out the following week.

54.  On July 28, 2014, an email, attaching both a cover letter for the award and the award, was purportedly sent by Carmen Preda (Exhibit D).  The evidence shows that this letter was prepared in the Schein law office. Upon information and belief, the award sent on July 28 was also prepared in the Schein law office.  Two of the

12

arbitrators' signatures were dated July 25, 2014.

55.  Although this emailing should have been limited to counsel for the parties and the arbitrators, it was also addressed to some of the secretaries for the arbitrators and respondents' attorneys. The attached letter of July 28, 2014, purportedly from Carmen Preda, does not list counsel for petitioner at all, but incorrectly lists petitioner in his place.  It also lists Samantha Prasad, Esq., an attorney in Schein's office, as a recipient of the July 28 letter and award, rather than listing Schein.  Prasad had never been involved in the arbitration and therefore would not have been known to Preda.

56.  Most importantly, this letter lists Hughes' counsel Nathaniel Dudley at his former firm (prior to January 21, 2013) at McGivney and Kluger, P.C., sent "Via Email to: ndudley@mklaw.us.com" - an email address which  had not existed for over a year and one-half.

57.  Preda did not send the July 28 email to Dudley at the wrong address or later send an original of the award to Dudley at the wrong mailing address, because Dudley admitted receiving both of these documents in a letter dated September 4, 2014.  Thus, it is clear that Carmen Preda knew Dudley's correct addresses and that the misaddressed July 28 letter was not made by her.  As will be shown, the wrong Dudley addresses are mistakenly being used by Schein's law office and thus ties the drafting of this letter to his office.

13

58.   Also, on July 28, 2014 in a separate email to petitioner and his counsel, Carmen Preda sent a new invoice for a total of $5,390 showing two purportedly open invoices: the May 16, 2014 posting for the increased claim showing an outstanding balance of $3,390.00 with the explanation: "refund - $3,390.00," even though such amount has never been refunded - at least not to petitioner, and another posting for $2,000 for December 1, 2011 for "Fee for Increased Claim." As noted the May 16 posting was paid on June 23.  The December 1, 2011 posting had been paid on December 12, 2011.  Both posting make no sense and are incorrect and this invoice has not been paid. (Invoice and email of July 28, 2014 attached as Exhibit E).

59.  It appears that the purpose of the July 28, 2014 invoice consisting of two previously paid items was to give an excuse for the delay of the award between May16, 2014 or earlier and July 28, 2014 by claiming that the reason for the delay was because petitioner had not paid outstanding invoices  -  something clearly not true.

**Evidence tying the false May 6 and July 28 letters to respondents' law firm.**

60.  On August 26, 2014, petitioner's counsel sent a letter to the arbitration panel stating in part:

> "[T]here is evidence that the ICDR's administrative process has been interfered with by respondents.  This raises the question whether this is the award which the arbitrators intended to issue." (Letter attached as Exhibit F).

14

In addition, the letter pointed out numerous factual mistakes and omissions contained in the award.  A copy of this letter was sent to all arbitrators, Carmen Preda at the ICDR and all counsel for respondents.

61.   Within a few days after this letter was sent, the arbitration chairman's secretary, Michelle Walker McCall, was fired by his law firm.  Upon information and belief, such termination was related to this case.

62.  At no time did anyone from the ICDR inquire of petitioner's counsel as to the evidence which petitioner's counsel claimed showed that the "ICDR's administrative process has been interfered with by respondents."

63.  On September 4, 2014 Schein's law firm, Minden Gross, sent an email to the arbitrators and counsel responding to petitioner's motion to the arbitrators of August 26, 2014.  (Copy attached as Exhibit G).

64. The Schein email address for Nathaniel Dudley to which this email was sent is given as "ndudley@mklaw.us.com."  As previously pointed out, this email address has not been in existence since January 21, 2013 and this same mistake was also made on the July 28, 2014 covering letter for the award purportedly sent by Carmen Preda.

65.  This email also attached a letter from Schein's law firm, which listed Nathaniel Dudley at McGivney and Kluger, P.C., a firm he has not been with since January 21, 2013 (Exhibit G).

66.   The fact that the same, inexplicable mistakes appear on documents emanating from Schein's office as well as those purportedly coming from Carmen Preda at the ICDR demonstrates that the ICDR documents sent by Carmen Preda to petitioner and his counsel were drafted by the Schein office and sent with the cooperation and assistance of Carmen Preda.

67.   Such drafting of documents by Schein's office for use by an ICDR employee demonstrates that the respondents have corrupted the process of the ICDR and interfered with the May award being delivered to petitioner.

68. It also appears that the award was drafted at Schein's law firm.  This is shown by the use of the phrase "not surprisingly."  Thus, the third sentence in the July 28 award reads: "Not surprisingly, the investment has not lived up to his expectations ...."  Schein writes on page 4 of his post hearing brief: "Not surprisingly, Claimant's first argument ... completely misses the point ...."  Paragraph 3 of his prehearing memorandum reads: "Not surprisingly, Sexton's bizarre assertions are completely unsupported."  These are telling expressions, particularly when coupled with the lack of sophistication demonstrated in the writing of the award. (see paras. 87-88 infra).

**The arbitrators' reply.**

69.   On September 22, 2014, the chairman for the arbitration panel sent an email denying petitioner's motion and stating that the July 28, 2014 award "is the Final

Award signed by each arbitrator and intended to be their Final Award in this arbitration proceeding." (Exhibit H, p. 2).

70.   Given the evidence submitted above, petitioners allege upon information and belief that the arbitrators made such an incorrect statement in order to prevent severe embarrassment to the ICDR.  The arbitrators' response also does not rule out the existence of the earlier May 2014 award.

**Previous acts by Respondents interfering with the Judicial Process in this Case.**

71.   Respondents during the course of the arbitration substituted documents prepared by them in order to prevent non-party witness, who had been subpoenaed by the arbitration panel, from delivering the real documents.  Such interference occurred with respect to two witnesses: David Dellacato and Vincent Lecavalier.  In addition, respondents interfered with the appearance of a non-party witness at the hearings, Justin Sather.  The facts with respect to each will be set forth.

72.   Such interference demonstrates respondents' willingness to act in an extra judicial manner so as to prevent the proper administration of justice.

**David Dellacato.**

73.    The arbitration panel voted to subpoena David Dellacato ("Dellacato"), because he was another shareholder in the Red Star Poker enterprise.  The subpoena was served on him on November 15, 2012.

17

74.   Examination of the envelope containing the documents produced by him disclosed, despite an attempt to obliterate this, that the documents were sent to the United States from a foreign country.  Further, the documents themselves showed that the emails had been printed out on November 11, 2012 - before the subpoena was served.

75.   Confronted with these facts, Dellacato claimed in an affidavit that on November 12, 2012 he "had participated in a conference call with Mr. Karam and ... A. Irvin Schein," that at Schein's request he had sent the documents he intended to produce to Schein on November 15, that he did not retain a copy of the documents he sent to Schein and that he later asked Schein to send the documents back to him because he could no longer print them again from his computer due to "Hurricane Sandy."  (Hurricane Sandy occurred on October 29,2012 and apparently had not interfered with his computer on November 11-12).  Dellacato claimed that Schein sent them back on November 16, 2012.  (Exhibit I).  Since Schein was not counsel to Dellacato, it was improper for him to inject himself into Dellacato's production.

76.   Examination of the documents produced by Dellacato showed that many were printed in color. Dellacato testified at the hearings that he could not recall how the documents came out, "but I am sure black and white."  Given the circumstances, it would appear that Dellacato did not produce his true Red Star shareholder

documents and that Schein sent substituted false Red Star documents for Dellacato to produce, and thereby interfered with a witness subpoenaed by the arbitration panel.

**Vincent Lecavalier**.

77. As shown by the following facts, respondents similarly interfered with the production of documents requested under a subpoena issued by the arbitration panel to Vincent Lecavalier ("Lecavalier").

A. On October 3, 2013, petitioner's counsel sent an email to Lecavalier at the email used by Red Star Poker to communicate with him - vinni444@gmail.com. This email offered Lecavalier the option of having the subpoena served upon him in a confidential manner.  No response was ever received from Lecavalier to this email and petitioner now believes that this was a fake email address used by Karam to make it appear to petitioner that he was receiving the same communication as other Red Star Poker shareholders, when in fact he was not.

B. On October 4, 2013 service was made by leaving a copy of the subpoena with the person in charge of the Philadelphia Flyers Skate Zone (the location where the Flyers practice hockey).

C. When no response was received as the result of leaving the subpoena at the Flyers Skate Zone, personal service was made on Lecavalier outside his New Jersey home on October 10, 2013.

D.  On Sunday, October 13, 2013, counsel for petitioner called Lecavalier on his cell phone.  Lecavalier stated he had received the subpoena outside his home, and was not aware of any prior subpoena or the email.  He stated that he anticipated hiring an attorney, probably from Montreal.  He said his records relating to Red Star Poker were in Tampa, which he stated is where his family still resided.  Finally, he admitted that he had been an investor in Red Star Poker.

E.  Counsel for petitioner subsequently received a letter from Brooke Madonna, an attorney from the firm of Spector Gadon & Rosen P.C. in Philadelphia, stating that she represented Lecavalier.  The letter was dated October 11, 2013,  was sent via the U.S. Post Office and was received by counsel for petitioner on October 21, 2013.

F.  But the documents received from Brooke Madonna on behalf of Lecavalier showed that they had been forwarded to her from the email address of vinni444@gmail.com - the one which counsel had sent Lecavalier an email he knew nothing about.

G.  Additionally, the email produced by Brooke Madonna showed that it had been forwarded to her on October 7, 2013 - before Lecavalier even knew he had been subpoenaed and before he knew he had retained a lawyer.  Lecavalier testified at the arbitration hearing that he had looked for documents after October 10.

78.  Based on the above facts, it would appear that the documents received by petitioner under the arbitrators' subpoena were not really produced by Lecavalier and did not come from his records but were produced by respondents in order to conceal the true records.

**Justin Sather.**

79.  Sather, as one of the founders of Red Star Poker and the person through whom petitioner invested in this enterprise, submitted a witness statement on behalf of petitioner and was scheduled to testify at the hearings on petitioner's behalf.

80.  Among the facts which he was scheduled to testify about was that Vincent Lecavalier was a shareholder in the Red Star Poker enterprise, a fact which Lecavalier ultimately denied, and had invested $1 million in it.

81.  On November 30, 2013, counsel for petitioner asked Sather to call him to set up a convenient time for his testimony at the hearings scheduled to commence December 9, 2013. On December 2, 2013, Sather sent a message that he was "between flights" and that he would call "tomorrow."  But counsel for petitioner never heard from Sather prior to the hearings.

82.  At the hearings Shushkovsky was questioned about his communications with Sather.  In response to a question by one of the arbitrators, Shushkovsky stated that Sather  was in New York and called him on Monday, the first day of the hearings,

and said that he didn't think he was "going to show up" at the hearings. Prior to that, Shushkovsky claimed that he had not spoken with Sather for three years (transcript Exhibit J, p. 960/19-963/19) (Exhibit J is organized according to page number).

83. Shushkovsky on redirect from his counsel then testified Sather had told him that "he had lunch with Mr. Trager in New York and was told that unless [he] signed this [witness] statement ... [he] will be sued" as a respondent (transcript, p. 969/15 - 970/6).

84. But the lunch between Sather and counsel for petitioner occurred on April 1, 2013 and Sather signed his witness statement and faxed it to counsel for petitioner on January 28, 2013 - over two months prior to the lunch.  And on May 3, 2013, Sather sent an email to a private investigator with a copy to petitioner stating: "I [Sather] am considering joining his claim against my old company Red Star Poker."

85. Thus, it appears that shortly before  the hearings on the week of December 9, 2013, Sather reversed his position.  Upon information and belief, this change came about as the result of payments made by respondents, thereby causing Sather not to testify in petitioner's behalf.

## II.   IF THE JULY 28, 2014 AWARD IS IN FACT THE FIRST AND ONLY AWARD ISSUED BY THE ARBITRATION PANEL, IT SHOULD BE VACATED ON THE GROUND THAT IT IS NOT A REASONED AWARD.

86. Applicable ICDR Article 27(2) requires that "the tribunal shall state the

reasons upon which the award is based...." An examination of the July 28 award shows such lack of knowledge of the basic facts and such underlying prejudice of the arbitrators as to make this award unreasoned.  Such an award should be vacated pursuant to 9 U.S.C. section 10(a)(2) for "evident partiality" and section 10(a)(4) for an award "so imperfectly executed ... that a final, and definite award upon the subject matter submitted was not made."

87.  The opening statement in the award demonstrates the pre-existing mind-set of the arbitrators:

> "Nearly ten year ago, Claimant invested $150, 000 in a start-up gaming company called Red Star focused on the Russian-language market, a business he knew little about.  He invested through a close corporation and did not know the other investors. <u>Not surprisingly, the investment has not lived up to his expectations...."</u>  (emphasis added).

88.  That the arbitrators would find that investing in a business which a person knew little about would "not surprisingly" result in a bad investment shows a pre-existing mind-set against petitioner and the award's misstatement of the facts and the glaring omissions of critical facts demonstrate the desire to obtain a result against petitioner.

89.  Although a reasoned award is required by the ICDR rules, out of a 66 page award, consisting of recitation of facts bearing little apparent relevance (such as the fact that petitioner at the very outset had a different attorney and devoting 12 pages

23

to the proceedings prior to the hearings) and a recitation of what the panel thought were the contentions of the parties, only three pages are devoted to the panel's reasoning (pages 60-63), and starts with the holding that the "Tribunal adopts the position of the Respondents on all of the Claimant's material factual allegations." Of course, those are the positions set down in the award as being the positions of the respondents and the claimant.

### Arbitrators' Finding that "Ms. Mitchell admitted that she did not review RSP Entertainment's financial data" Is Without Basis.

90. Central to petitioner's case was the investigation by petitioner's expert forensic accountant, Lynn Mitchell. Her report is attached as Exhibit K.

91. Her report is central to this case because petitioner claimed that the Red Star Poker enterprise was highly successful and that he had been frozen out of this success.

92. In order to demonstrate the extent to which Red Star Poker was a success, it was necessary to examine the financial records of this enterprise to see whether they were reliable and if reliable, what financial success did it achieve.

93. Because CC Capital is only a holding company, Mitchell focused her efforts on the financial information shown to petitioner by respondents for what respondents' claimed was the operating company for the Red Star Poker site called RSP Entertainment N.V. ("RSP"). Among her more important findings (references

are to paragraphs in her report):

      a. RSP has no bank accounts in its name. (para. 28).

      b. All information on its books as to revenue comes from end of the month invoices sent by Cake which up until 2012 administered the software for the Red Star Poker site.  It was not posted in real time but only by journal entry (para. 35).

      c. Most of RSP's direct operating expenses are also based on reports from Cake (para. 38). She noted that cost of sales or direct expenses "usually fluctuates in direct proportion to revenue" but that these did not follow such a rule and raised "concern that the cost of sales is either being mismanaged or misreported" (para. 39).

      d. All the revenue accounts and all expenses directly relating to gaming are recorded by journal entry each month. "In other words, they are 'on paper' summary transactions not recorded in real time" from entities like Cake (para. 34g). There is no way of verifying the accuracy of such figures from the data shown to Mitchell (para. 47).

      e. Player deposits were kept in e-wallet accounts at 24 "Merchant Accounts."  Karam testified that no statements from these Merchant account were available and that the "only way RSP could obtain information as to the activity and balances in the Merchant accounts was for a person to go online to each merchant account website and write down the information."  Such transitory numbers "may not

even be auditable because the account detail viewed by RSP personnel ... may no longer be available online for confirmation of the balances...." (para. 43).

f. Player deposits and withdrawals were not recorded in real time but only adjusted at the end of the month (para. 45).

g. The lack of information regarding player deposits in e-wallet accounts makes it possible that "money in the Merchants Accounts which was owed to RSP as rake income or other income from casino or sports betting could have been diverted by RSP to undisclosed bank accounts" (para. 46).

h. A handful of payments made out of the "players' account" as shown on the RSP ledger were to entities whose wire transfers described them as "marketing services" rather than return of player funds (para. 52).

i. The monthly entry for the "Due to Players" account is a "plug" number - one put in "to make the Merchant Account balances agree with the 'Red Star Poker Client Funds Report'.... These entries call into question the validity of the balance in the Due to Players account, and add to the lack of transparency in RSP's accounting record" (para. 53).

j. Dividend payments were made to CC Capital shareholders directly out of the Due to Players account. "It does not make sense that a dividend payment would be paid out of an account that supposedly holds players funds" which should be "held

in trust for players" (para. 55).  Karam's witness statement admitted this.

k. The Mitchell report concluded that "the financial statements produced by [CC Capital] and RSP are unreliable for determining the value of Sexton's ownership interest ...."  (para. 59).

94.  Ms. Mitchell was extensively crossed examined about her report relating to her analysis of RSP's financial records.

95.  Despite her report and extensive testimony concerning RSP's finances, the award states that "Ms. Mitchell admitted that she did not review RSP Entertainments's financial data." (award, para. 177, p. 51).  While this statement is listed under "Respondents' Defenses," the award, as previously noted,  goes on to state that "The Tribunal adopts the position of the Respondents on all of the Claimant's material factual allegations" and clearly adopts this position (para. 207, p. 60).

96.  Thus, on a critical issue, the award demonstrates that it is irrational - it cannot rationally state that petitioner's accounting expert did not discuss the most important financial records when the undisputed, documentary evidence shows the contrary.

**The award fails to discuss Mitchell's findings with respect to CC Capital and mischaracterizes her testimony and report.**

97.  The award simply ignores  Mitchell's findings with respect to the CC Capital financial reports which had been sent to petitioner. She found the following

with respect to these:

a.   Quarterly dividends paid to petitioner did not agree with any percentage of stock in his name and varied from quarter to quarter and year to year as a percentage of the total dividends paid (para.14b)

b.   Total dividends paid by CC Capital as of quarter 2 of 2010 totaled $2,244,389 but retained earnings were negative $462,394 and in fact should have been negative $2,303,229 (para. 14c).

c.   Dividends were paid in excess of profits "and it raises the question as to where CCC, on a consolidated basis with RSP Entertainment, obtained the cash to pay these dividends if these financial statements were accurate" (para. 14d).

d. To hide the excess dividends in the 2011 CCC Consolidated annual report, these dividends are buried in a "false asset titled 'Advance on Dividends'" (para. 14e).

98.  The findings demonstrated that although CC Capital financials might be compatible with RSP's financials, the existence of unexplained dividend sources demonstrates that the financials shown to petitioner did not represent the real ownership of Red Star Poker because there was another wealthy company which respondents have hidden.

99.  But the arbitrators either ignored Mitchell's findings or set forth a

demonstrably erroneous explanation. Thus, with respect to the false asset created to hide unexplained dividends, the award states: "Ms. Mitchell testified that Mr. Pissourios [the accountant for Red Star Poker] had adequately explained that situation." (para. 179, p. 51). The award cites page 10 of respondents' post hearing brief, which in turn references transcript pages 1346/10-25, which reads in relevant part: "Q. Now, Mr. Pissourios provided a response to your report, correct. A. correct." Hardly a statement that Pissourios had adequately explained the false asset. (transcript Exhibit J).

100. The award also ignores the findings by Mitchell with respect to audited statements for CC Capital produced by Karam and Shushkovsky during discovery. Concluding that these statements were "unreliable and untrustworthy," Mitchell noted that the 2008 Cash Flow from Financing Activities does not add up mathematically in that the details add to negative $1,054,693, but the statement reports only a negative $707,486, a $347,207 difference, which means that for the cash to balance CC Capital "would have had to receive an influx of cash in 2008 from some unreported source" (Exhibit K, para. 21).

**The Award Ignores the Evidence that the invoicing from Cake was fictitious.**

101. As pointed out by Mitchell with respect to RSP, all of the income and most of the expenses were dependent on monthly reports received from Cake. Thus,

the accuracy of the RSP financials were totally dependent on Cake.

102. The award fails to even discuss the evidence adduced showing that the Cake invoices were simply fictitious invoices.

103.  Winter testified that the monthly Cake invoices consisted of Excel spreadsheets to which were attached backup spreadsheets supposedly justifying these invoices.

104.  But examination of these monthly spreadsheets at the hearings showed that they had little or no backup spreadsheets, as Winter was forced to admit (transcript, Exhibit J, p. 1134/22-1135/25; 1153/15-1154/3; 1159/13 -1160/9; 1166/2-6; 1169/25- 1171/4).

105. Although these invoices were supposed to be generated automatically from Cake servers in Curacoa or Spain, an examination of the spreadsheets showed that Winter or his assistant in Canada was involved in their production (transcript, 1160/12 -1161/23; 1173/14-18).

**The award ignores the evidence that Hughes' "sale" of his CC Capital Shares to Cake was paid for by Red Star Poker by manipulating the Cake monthly invoices and was fictitious.**

106.  The contract for the purchase by Cake of Hughes' 18% interest in CC Capital closed on June 18, 2009,but Hughes claimed that he started negotiating this transaction at the end of 2008.

107.  According to Winter, the most important number on the monthly Cake invoices was "player transfer reconciliation" - it "drove the invoicing" (transcript, p. 1126/17-18). This number was supposed to reflect the balances owed by the players on the different poker sites which were part of the Cake system.  If players on the Red Star Poker site in the aggregate  won more than players on the other sites during the prior month, then Red Star Poker would be credited with the surplus on its monthly invoice for reimbursement by Cake which acted as the clearinghouse.  Likewise, if Red Star Poker players had lost as compared to players on the other Cake sites, then Red Star Poker would owe Cake the difference which would appear on the monthly invoice.  These transfers were supposed to reflect only the transfer of player funds and to have no impact on Red Star Poker's finances (transcript p. 1127/13-17).

108.  Total payments to Hughes amounted to approximately $2.2 million which was the "benchmark" number established in the June, 2009 contract.

109. But the invoices for March and April 2009 showed that Red Star Poker owed Cake for player transfer reconciliation $1,652,606 and $580,863, respectively. These two payments total $2,227,927 - about the same amount as the "benchmark" of $2.2 million called for in the June 2009 contract and sufficient to pay for Hughes's shares.

110.  Mitchell noted that the Cake invoices for March 1 and April 1, 2009

31

"shows an extremely anomalous amount due to Cake from RSP" (Exhibit K, para. 48). Respondent Karam explained that during those two months, there were some very high stakes players, who were not very good and who lost their money to players on the other sites (as opposed to losing to players on the Red Star site because losing to players on the Red Star Poker site would not involve any transfers to another site through the Cake clearinghouse) (transcript, Exhibit J, p. 833/16-834/18).

111.  Records from the bank making the transfer to Cake for Red Star Poker of these funds showed that the funds did not come from player funds, but Red Star Poker funds and Karam informed the bank that the reason for the transfers were "software" services, as opposed to transfer of player funds.  Karam's explanation of high stakes poker players is also at odds with his email of March 25, 2009 where he states that "we have been working at eliminating any reliance on rake from high states games and certain high rake players" and noting that "in February we had 7 players over $5K in rake and no one over $10K."  (February playing would be reflected in the March 1 invoice) (Documents collected at Exhibit L).

112.  In addition to the over $2.2 million transferred to Cake by Red Star Poker at the time of the Hughes-Cake transaction, Hughes admittedly had a CC Capital "dividend" for the quarters ending December 31, 2008 and March 31, 2009 in the amount of $125,000 transferred to Cake after the contract closed in June 2009 to help

Cake pay the cost for Hughes' CC Capital shares. (Thereby converting what would have been ordinary income to Hughes into a capital gain) (transcript, p. 1058/17-1060/20).

113.  These CC Capital shares never seemed to reflect any reality because the dividend records prepared prior to the commencement of litigation show that no dividends were ever paid to Cake on these CC Capital shares after the alleged transfer.

114.  The lack of reality to the transfer is further demonstrated by Karam's disclosure at the arbitration hearings that in October 2013 Cake gave the CC Capital shares it had allegedly acquired to Red Star Poker in exchange for debt in the amount of "approximately $400,000" because Cake was having difficulty paying transfer reconciliation money (transcript, p. 743//23- 744/19). Unexplained is why Red Star Poker wanted to acquire shares of its alleged parent holding company and why there should be a debt arising from the transfer of player deposits. (Of course, given the fact that players may take their winnings out in about two days, for Red Star Poker or any other site to wait for reimbursement for 60 days between invoicing and payment casts doubt as to whether this monthly invoicing of player transfers was the method really used on the Cake system).

115.  Casting further doubt on the reality of the Cake-Hughes transaction for CC Capital shares is the lack of any email relating to the making of this contract.

Hughes claimed he lost his in a computer crash, but could not explain how he produced email from 2008-09 on other matters (transcript, p. 1050/4-1055/25).  Cake minute books do not reflect the transaction although its former counsel admitted that this was not a routine transaction. There was no evidence that authority to enter the contract had been given by the one person at Cake authorized - Mellios and the contract identified Hughes' email as [kenthughes@comcast.net,](mailto:kenthughes@comcast.net) an address he had not used since at least January 2007.

116.  But without citing any evidence, or discussing the above facts, the award simply states its preordained conclusion that "there is no credible evidence in the record that the sale was a shame [sic] or was later reversed." (para. 207e). This is not a reasoned award.

117.  Certainly, there was significant evidence, which the award should have discussed, showing that Hughes' "sale" of CC Capital shares was simply a method of getting some of his money from Red Star into the United States and that Hughes remains one of Red Star Poker's shareholders.

**The award's conclusion that "there is no credible evidence to support Claimant's argument that the owners of Red Star did not hold that investment through CC Capital" and that "nothing in the evidence presented by third part[y] Vincent Lecavalier materially supported Claimant" is unreasoned.**

118.  The award states that "nothing in the evidence presented by third part[y] Vincent Lecavalier ... materially supported Claimant's case in any way" and that

"there is no credible evidence to support Claimant's argument that the owners of Red Star did not hold that investment through CC Capital" (paras. 207g and h).  In making these statements the award simply ignores the following evidence which demonstrates the lack of reality to CC Capital.

119.  With respect to Lecvalier, Karam's banking records show that Lecavalier wired a total of $623,388.31 on March 28 and April 8, 2005 to Karam's bank account for an investment in Red Star Poker.  But CC Capital's shareholder records shows an investment as of March 1, 2006 of only $300,000 in the name of YCT 2005 Trust. . In February 2008, another $200,000 appears in the name of YCT trust.  Lecavalier could not explain why the CC Capital shareholder records do not agree with the amounts he paid in 2005 (transcript, Exhibit J, p. 1445/13-1446/4). And the dividend record made prior to the start of the arbitration proceedings shows all dividends paid to Lecavalier - not to the trust.

120.  Emphasizing the lack of reality to anyone's CC Capital shares is the fact that Lecavalier testified that in January 2011 "his father" gave back his shares in CC Capital by transferring them without any consideration to Vereker Limited - a company controlled by Karam and Shushkovsky. And Lecavalier invested another $400,000 to become a shareholder in Russlar Corp., another Russian company controlled by Karam and Shushkovsky.  Lecavalier currently remains a shareholder

in Russlar. (transcript p. 1463/8-1464/11).

121.    Communications via email from Karam on behalf of Red Star Poker supposedly to CC Capital shareholders were addressed to Lecavalier at vinni444@gmail.com, an address at which Lecavalier did not receive a communication from counsel to petitioner and which appears to be controlled by someone other than Lecavalier.

122.  Other facts demonstrating the unreality of CC Capital, not dealt with by the arbitrators in the award are:

A.  No one other than petitioner seems to have signed the CC Capital shareholder's agreement.  None of the respondents ever produced a copy. Although Karam produced an email to Dellacato in November 2005 asking Dellacato to send his signed agreement to Hughes (a lawyer by profession), Hughes knew nothing of this email, never saw a signed shareholders agreement from anyone and did not recall signing his own (transcript, p. 1041/21-1-42/22).

B.  When Hughes purported to sell his CC Capital shares to Cake, he "forgot" about the provision in the shareholders agreement requiring that the offer be made to other shareholders (transcript, p. 1043/8-14).

C.   When Karam wanted another subsidiary for his Russlar company, he took a supposedly wholly owned subsidiary of CC Capital and changed

its name to Liquid Rubber Europe so he could use that corporation.  He forgot it was a CC Capital subsidiary.  The award states that "Claimant failed to demonstrate how this event damaged CC Capital or him." (para. 207k).  That statement totally misses the obvious point: the use of the so-called CC Capital subsidiary by Karam shows that neither he nor anyone else regarded CC Capital as a real company whose subsidiaries had to be respected.  Petitioner never claimed damages arising from this fact.

D.   When Jeff Glass, a hockey client of Shushkovsky, invested $150,000 in the Red Star Poker enterprise, he did not do so with an investment in CC Capital but bought 28 shares in Vereker Limited.  Yet Karam testified that Vereker Limited is supposedly only a service company for Red Star Poker and not designed to make a profit (transcript, p. 817/5-818/23).

E. There appear to be shareholders other than those listed in the CC Capital shareholders record.  Dividend records show Alexander Kostritsyn, a famous Russian poker player, receiving dividends, but he is not a shareholder. Ilya Kovalchuk, a well known hockey player, is listed in a document prepared by Hughes in 2005 as an investor (Exhibit M).  He attended the launch of Red Star Poker in June 2005 and his jersey is offered by Red Star as a promotion to players to play on the Red Star site.

F.   Although Cake performed the software services for the Red

Star Poker site from 2007 until 2012, no signed contract was ever produced and Cake's former counsel and Hughes both said they could not recall seeing an executed contract (transcript, Exhibit J, p. 1040/15-23; 1219/4-1220/20).

G. The "sale" of Hughes stock in CC Capital and its subsequent return to Red Star for a "debt" of Cake to Red Star.

H. The failure of CC Capital to pay "dividends" to Cake on the Hughes shares.

I. Hughes recognized that the financial statements for CC Capital and the underlying company RSP were worthless and CC Capital a myth, because Hughes offered as a witness his financial adviser, who admitted that even though he was supposedly advising Hughes on the value of his interest in Red Star Poker, he was never given any of the financials for these companies and had never heard of CC Capital (Aunger, transcript, p. 1246/18-1247/7). If CC Capital were truly the owner of Red Star Poker, surely Hughes would have told his financial adviser about it and given him the financials.

J. The findings by petitioner's expert Mitchell that showed dividends being funded by money from a source not disclosed in either CC Capital's or RSP's financial records. This demonstrates assets in another undisclosed entity.

123. The above facts are essentially undisputed, yet the award does not deal

with them.

124.  For a more detailed discussion, see the attached copy of petitioner's post hearing memorandum (Exhibit N).

WHEREFORE, petitioner requests that the award from the ICDR of July 28, 2014 be vacated on the grounds that (1) the award of July 28, 2014 was procured by corruption in that it was corruptly substituted for an earlier award submitted by the panel to the ICDR in May, 2014 and (2) that the award did not comply with the ICDR rules pursuant to which the arbitration was required to be held in that it was not a reasoned award because it irrationally misstated critical and material facts and/or omitted such critical and material facts. Petitioner also requests that petitioner be  allowed to conduct discovery with respect to fully developing the facts relating to the procuring of the July 28, 2014 award by corruption.

Dated: New York, NY
　　　　October 9, 2014

Yours, etc.

_S/_____

Leslie Trager (lt 8995)
230 Park Avenue
10th floor
New York, NY 10169
212 721 1192
tragerlaw@gmail.com